**FALLS CHURCH AIRPARK CO., Inc.,**
Appellant,

v.

**MOONEY AIRCRAFT, Inc., Appellee.**
No. 16995.

United States Court of Appeals
Fifth Circuit.
April 30, 1958.

W. B. Patterson, Robertson, Jackson, Payne, Lancaster & Walker, Dallas, Tex., for appellant.

Hal F. Rachal, Midland, Tex., for appellee.

Before HUTCHESON, Chief Judge, and BROWN and WISDOM, Circuit. Judges.

JOHN R. BROWN, Circuit Judge.

This appeal by Falls Church Airpark Co., Inc., the Bailor, from a judgment entered on a jury verdict for the Bailee, Mooney Aircraft, Inc., makes the frontal attack that the Court erred in not instructing a verdict in the Bailor's favor for the total loss of its airplane.

Bailor was a distributor in the Washington, D. C., area for Mooney Aircraft. Included in its inventory of craft for sale was the Mooney Mark 20 numbered N–850 B, a light 150 h.p. single engine plane. Bailee, as manufacturer of these planes, presumably out of its natural business interest in enabling its distributor dealers to sell and service craft of favorable public acceptance, sent out memoranda to the distributors from time to time. Two of these were sent to and received by Bailor. One, dated March 5, 1956, advised that planes of specified manufacturer's serial numbers (which included N–850 B) if found on the described inspection to have certain holes drilled through the lower tail cone longerons, could be returned to the factory at Kerrville, Texas, for necessary alterations without cost to the airplane owner for material and labor. The other, of March 12, 1956, was an announcement that certain described improvements in the Mark 20 standard equipment were available for specified planes previously delivered. These were in a so-called kit containing necessary parts for the exchange and installation of the new equipment. These improvements were, however, to be done at the expense of the aircraft owner. By long distance telephone conversations arrangements were made for the Bailee to do both of these jobs in Texas. Bailor was to, and did, fly N–850 B from Washington to Kerrville, Texas. The plane performed satisfactorily and was apparently in good condition on arrival there.

Here a minor dispute arises in a record which is otherwise singularly uncontradicted. The Bailor claims that upon the arrival of the plane at Kerrville, Bailee stated that one of these two jobs was to be performed at Midland, Texas, approximately 300 miles away and that it would be necessary for Bailor to fly the plane there. On the other hand, the story of the Bailee, which we must now assume was credited by the jury, was somewhat different. In this version, no work was to be done on N–850 B at Midland, but Bailor was told that another new undelivered Mooney Mark 20, previously purchased by Bailor, was then undergoing final outfitting at Midland, and if the Bailor desired to fly N–850 B to Midland to enable its pilot to pick up the new plane for flight to Washington, D. C., Bailee would fly N–850 B back to Kerrville, so that the agreed work could be performed.

■ We regard this evidentiary controversy as of little moment for at least two reasons. First, in either case, the Court below held, as a matter of law, and there can be no substantial attack on it here, that the total circumstances made it out a bailment for the mutual benefit of both parties, cf. Bill Bell, Inc., v. Ramsey, Tex.Civ.App., 284 S.W.2d 244, and not, as Mooney claimed, a mere agency in which it was flying the plane as Bailor's agent. Second, as we discuss more fully, no repair or alteration or work of any kind was done to the plane at Midland. It was merely kept in the Bailee's hangar at Midland for a day or two.

On the morning of June 1, 1956, the president of Bailee, an experienced pilot with requisite CAA license undertook to fly the plane from Midland to Kerrville. While making a routine let-down from the cruising altitude of 10,000 feet preparatory to approaching the Kerrville Airport, the engine suddenly froze at about 4,000 feet. The admitted cause of this was a very fine crack in the rigid aluminum oil line extending from the rear of the engine cooling baffle to the rear engine accessory section.

What the pilot did in the next few moments as he hovered over the brink of eternity was fully explained. This included not only his own detailed factual testimony, but expert testimony from an interested fellow-stockholder-director and officer which the jury could fully credit. Whether his handling of the plane in this *extremis* was prudent, or whether the complete destruction of the plane from the crash landing was because he landed too soon or too late in the emergency field, was the subject of prolonged examination direct and cross, fact and ex-

pert. By a charge acceptable to both parties using special interrogatories, F.R.C.P. 49(a), 28 U.S.C.A., the area of this controversy was reduced for jury decision to whether the pilot used too limited a portion of the field picked out for the emergency landing and if so, whether that was negligent. The jury's affirmative answer to the first, and its negative answer to the second, inquiry was an approval of these maneuvers and an exoneration of any charge of fault insofar as it related to the manner in which the plane was being flown or the action taken to extricate plane and pilot from the jaws of disaster by a forced landing in very hilly, rocky terrain.

As the only two possible causes for the destruction of the plane revealed by this full disclosure were either improper handling in flight and the emergency landing or the cracking of the oil line, exoneration by the jury on the former, narrowed the case down to the latter.

As thus narrowed, it sharply emphasizes that in reality what the Bailor seeks by the use of the favorable presumptions arising from the bailment is the equivalent of a breach of warranty apparently long after the expiration of the warranty period on the fortunate coincidence that the Bailee happened to be the manufacturer-seller as well. Indeed, this asserted deficiency in the rigid oil line was called to distributor-dealer's attention by a memorandum of May 30, 1956, stating "There have been several incidents of oil loss in the Mark 20 due to certain metal oil lines developing cracks * * *" and suggesting that for planes of the particular serial numbers (which included N–850 B) the plane owner wishing "* * * to make a similar improvement * * * can order this flexible hosing complete with hardware in kit form from the factory at the list price of $12.93." After this crash and the near loss of the stockholder-officer-pilot, a service letter dated June 5, 1956, was sent along with the necessary replacement flexible oil line and parts which were billed at material cost only with an urgent request that the letter of instructions "be complied with immediately."

■■ While the unique combination of Mooney as both manufacturer and Bailee may well have given it some special knowledge which, with respect to the oil line, imposed on it a duty over and beyond that which an unrelated Bailee might have, we must keep carefully in mind that the obligations are distinctly different. Mooney, as Bailee, owed the duty of exercising due care in keeping and operating the plane, in inspecting and making the plane ready for flight. It did not, however, have a duty to make, at its expense or without request of the owner, whatever alterations or repairs might be needed. Whether, with the unique manufacturer's knowledge, it had a duty to make a special inspection of the rigid oil line before commencing the flight or in the light of it should have refrained from commencing the flight on June was at most a question of fact. The pilot testified that his inspection consisted of a check of the oil level, propeller, landing gear, controls and fuel, all of which were found to be satisfactory. What inspection could be made, whether a prudent Bailee would have done more or less, whether an inspection could readily be made without disassembly of the engine or parts, were questions for the jury. Here, as with the issue of the handling of the plane, the jury gave answers to precise interrogatories. The jury found that the Bailee was not negligent in failing (1) to change the rigid oil lines or (2) to inspect the rigid oil lines prior to the take-off. On this record, we certainly could not say that this is without substantial support in the evidence. From the location of the oil line in question, it could not be inspected without a removal of it. The actual oil line which failed, included as a part of the record here, reveals that the tiny crack was close to the end of the tubing. To have found it prior to flight would have required that the coupling fitting must be unscrewed. To do this, it was necessary to "remove both side cowls and left-hand spark plug access panel on top

of engine baffle." Apparently this had to be done with some care for in the instructions issued for replacement of rigid by flexible lines after this crash, the memorandum of June 5, 1956, stated: "caution—Hold rear baffle bulkhead fittings by nut on short end to prevent their turning and causing damage to aluminum lines inside engine baffles."

The location of this rigid oil line, the protection which the engine cowling gave to it from accidental external forces while the plane was in the Bailee's hangar at Midland, the complete absence of any work done on or to the engine by Bailee, the lack of any occurrence other than the simple storage of the plane, its fueling, removal from the hangar and preflight inspection, likewise adds up to a sufficient accounting under the principles of Alpine Forwarding Co. v. Pennsylvania R. Co., 2 Cir., 60 F.2d 734, 1932 A.M.C. 1504, stressed here so hard by Bailor because so often adopted by the Courts of Texas, Trammell v. Whitlock, 150 Tex. 500, 242 S.W.2d 158. The language of Judge Hand has been frequently quoted: "The bailor, upon proving the bailment and injury, is entitled to the benefit of a presumption of fault which the bailee must meet by showing, either how the barge was injured, or that however that was, it was not due to his neglect. * * * The second alternative requires proof of all that the defendant has done with regard to it." Alpine Forwarding Co. v. Pennsylvania R. Co., supra, 60 F.2d at page 736.

Here the Bailor likens the inability of the charterer of the barge in Alpine to show all that it had done with respect to the barge to negative an occurrence for which it was responsible in the springing loose of a bottom plank which was the immediate cause of the barge's foundering, to the absence in our record of specific word testimony that nothing the Bailee did could have caused the crack in the rigid oil line. Here, unlike the submerged bottom of the barge in Alpine which was exposed to numerous perils of damage during periods unaccounted for by the bargee's testimony, there is not the slightest showing that anything happened or reasonably could have occurred during the few days the plane was in Bailee's hangar to have caused any crack or condition resulting in a crack in the rigid oil line.

On the contrary, the standard epitomized in Alpine was affirmatively satisfied. There was a complete revelation by the eye witness supported by persuasive expert testimony showing " * * how the * * * [airplane] * * * was injured * * *," both with respect to the final event, that is, the crash from the emergency landing, and the initial cause, the failure of the oil line. And as to both the manner of flight and the defect of the oil line, the Bailee showed "that however that [the damage] was, it was not due to his neglect."

Assuming, as Bailor contends, that Trammell v. Whitlock, supra, expressly confines Exporters' & Traders' Compress & Warehouse Co. v. Schulze, Tex.Com. App., 265 S.W. 133, and Mustang Aviation, Inc., v Ridgway, Tex.Civ.App., 231 S.W. 677, writ refused, to situations of damage by fire or theft and such cases do not, as claimed by Bailee, establish a minority Texas view that where the damage is from fire, theft, or an identifiable *accident*, there is no presumption of negligence operable at any time, the Bailee fully met its burden.

The full revelation of this record was sufficient to show how the damage occurred both in the immediate and the proximate sense, and that, as to each of those causes, the Bailee was free from fault. Once the Bailee made this showing, the presumption evaporated. "The presumption on which the bailor may rely is a mere rule for the conduct of the trial. It puts upon the bailee the risk of a directed verdict if he does not meet it, but it does no more; once he has done so, it disappears from the case. Thus, it can never concern the jury." Alpine Forwarding Co. v. Pennsylvania R. Co., 2 Cir., 60 F.2d 734, 736; Trammell v. Whitlock, supra, 242 S.W.2d at page 159. With the presumption out of the way, the evidence must then be re-

garded by the jury as in the ordinary case to determine whether, on the preponderance evidence, the Bailee was negligent. Unless that finding is made, the verdict goes for the Bailee from the failure of the Bailor to sustain the burden of proof.

The jury here on precise issues, in form acceptable to all, found for the Bailee and against the Bailor. If, upon the evaporation of the presumption, there were other specific issues, no demand for submission was made and they are deemed to have been found in accordance with the judgment entered on the special verdict. F.R.C.P. 49(a).

Affirmed.