I. C. WEST, Appellant,

v.

H. Leon SLAUGHTER, Appellee.

No. 4252.

Court of Civil Appeals of Texas.

Waco.

Nov. 5, 1964.

Rehearing Denied Nov. 19, 1964.

Van N. Culpepper, Bryan, for appellant.

Goode & Sandstedt, College Station, for appellee.

TIREY, Justice.

This is an action in bailment. Plaintiff went to trial on his original petition and we quote the pertinent parts:

" * * * that on or about November 22, 1962, plaintiff and defendant entered into a contract of bailment, whereby defendant undertook for a consideration to paint a 1948 Stinson Stationwagon (an airplane) in the vicinity of Robertson County, of the cash market value of THREE THOUSAND FIVE HUNDRED and NO/100 ($3,500.00) DOLLARS. Thereafter, by reason of the carelessness and negligence of the defendant in carrying out the painting job, plaintiff would show that the airplane was totally destroyed by fire to plaintiff's damages in the amount of THREE THOUSAND FIVE HUNDRED AND NO/100 ($3,500.00) DOLLARS. (parenthesis ours).

" * * * that defendant was guilty of certain acts of omission and commission which taken together or separately, constitute negligence, and that such negligence was the proximate cause of plaintiff's damages:

"1. That defendant was negligent in drying the paint on the said Stinson aircraft with a lamp in such close proximity that the aircraft caught fire.

"2. In failing to take proper precautions to extinguish the fire after the fire had commenced.

"3. In attempting to hasten the drying process of the paint with a lamp while the same should have been allowed to dry without any heat from an artificial source."

The contract was oral. Defendant went to trial on a general denial.

The Court, in its Charge to the jury, submitted 15 Issues.

Pertinent to this discussion the jury found that immediately prior to the fire West heated the plane with a lamp, but that such was not negligence; that West's leaving the plane while he was doping and heating it was not negligence; that West left the plane unattended while he was heating and doping it with electric lamps, but found that such action was not negligence; that West failed to cut off the master switch on the airplane while he was away from the plane, but that such failure was not negligence; that at the time of the fire West did not fail to have a functioning fire extinguisher present on the premises, and fixed the market value of the airplane immediately before the fire at $775.00.

In the judgment we find this recital:

" * * * that on the 12th day of February, 1964 * * * plaintiff * * * filed * * * Motion for Judgment Non Obstante Veredicto on the ground that the jury's answer to Special Issue No. 2, Special Issue No. 3, Special Issue No. 4, Special Issue No. 7, Special Issue No. 8 and Special Issue No.

10 (these being the negligence issues) were not supported in the evidence and were against the great weight and preponderance of the credible evidence, and on the further ground that the undisputed evidence showed that the transaction in question was a bailment for mutual benefit and that under such bailment where goods have been committed to a bailee and have been lost or returned in a damaged condition that the bailee's liability depends on negligence and that such liability *it* presumed * * * and being of the opinion that the evidence raised no issue of fact other than damages, and that a directed verdict for plaintiff would have been proper on the issue of negligence, * * *." (Parenthesis ours.)

The Court granted the motion and awarded judgment for plaintiff for the sum of $775.00.

Appellant's Point 1 is:

"The court erred in granting appellee's motion for judgment non obstante veredicto on the ground that the evidence raised no issue of fact, other than damages, and that a directed verdict for appellee would have been proper on the issue of negligence."

Appellee's Counter-Points 1 and 2 are to the effect:

"1. * * * that the verdict of the jury on some of the various negligence issues was against the overwhelming weight of the evidence;

"2. * * * that this being a mutual benefit bailment, a general presumption of negligence on part of the bailee existed in this case."

There were no exceptions to the Court's Charge; nor did appellee file any cross-assignments.

We believe the pronouncements by our Supreme Court in Trammell v. Whit-lock, 150 Tex. 500, 242 S.W.2d 157, and the cases there cited, announce the rule to be applied in the disposition of this cause. We direct particular attention to the cases of Exporters' & Traders' Compress & Warehouse Co. v. Schulze, Tex.Com.App., 265 S.W. 133, and Mustang Aviation, Inc. v. Ridgway, Tex.Civ.App., 231 S.W.2d 677, er. ref. Our Supreme Court in Trammell v. Whitlock, supra, was dealing with a common law bailor and bailee contract. In announcing the rule the Court said:

"The liability of the defendant-petitioner accordingly must rest on his failure to exercise reasonable care for the bailed article, as in the usual case of a bailment for mutual benefit."

That is the exact situation here. The Court further said:

"If, assuming the fact of bailment, the evidence still presented a fact question of negligence, then the mere finding of a bailment would not support a judgment for the plaintiff bailors; but if, on the same assumption, the record compelled the conclusion of negligence, judgment should have been rendered in the trial court for the plaintiff-respondents, * * *.

* * * * * *

"The defendant-petitioner is correct in his contention that the burden of proof on the whole case, including the issue of negligence, is on the respondent bailor, * * *.

* * * * * *

" * * * 'The presumption on which the bailor may rely is a mere rule for the conduct of the trial. It puts upon the bailee the risk of a directed verdict if he does not meet it, but it does no more; once he has done so, it disappears from the case. Thus, it can never concern the jury'.

* * * * * *

"The rule is recognized in decisions such as Exporters' & Traders' * *

and Mustang Aviation, Inc. * * *, which held the presumption to disappear or not to exist, when there was evidence indicating the article to have been destroyed in a conflagration and there was no evidence other than the bare fact of a fire to suggest negligence on the part of the bailee. These decisions may be regarded as law in this state in so far as the language of the opinions is limited to the facts involved."

In the Schulze case, supra, which was a common law bailment case, we find the following statement:

"We have been cited to no case by the Supreme Court of our state wherein this question has been decided, and in the absence of such case we shall adopt that principle supported by the great weight of authority, and hold that, when the warehouse company showed that the cotton had been destroyed by fire, it then relieved itself of showing that the fire was not caused by its negligence, but that the burden then rested on the plaintiff to show that the fire was the result of the negligence of the warehouse company or its employees, and, the plaintiff having wholly failed to produce any evidence that the fire was the result of the negligence of the defendant warehouse company, the defendant was entitled to the peremptory instruction requested by it."

In the case at bar the plaintiff grounded his right to relief on the theory that the bailee had been guilty of negligence in three distinct particulars, and the case was tried on that theory and the jury acquitted the plaintiff of all negligence in each respect charged.

Since our Supreme Court gave a straight out refusal to the Mustang case, supra, we quote from the rule there stated:

" * * * in suits on contracts of bailment for hire, where the property is lost or damaged by fire or theft, no presumption of negligence is imputed to the bailee, and that the burden of proof to show bailee's negligence resulting in such loss or damage, rests on the bailor. * * * Negligence in fire, theft, storm or accident cases, is never presumed, and the mere happening of damage by such means is no evidence of negligence."

Our Supreme Court in the Whitlock case did not modify or change the above statement of the rule. The rule above stated has been necessarily and consistently followed by our Appellate Courts. See Stringer v. Yarbrough, Tex.Civ.App., 378 S.W.2d 416, n. r. e.; Falls Church Airpark v. Mooney Aircraft, Inc., 254 F.2d 920, pt. page 923; Texas City Terminal Ry. Co. v. American Equitable Assurance Co. of N. Y., 130 F.Supp. 843, pt. 15, page 863.

In the case at bar the plaintiff's original petition on which he went to trial showed that this suit was grounded on a common law bailment contract and that the plane bailed had been destroyed by fire, and under his pleadings and under the applicable law here cited, he assumed the burden of showing that defendant failed to exercise ordinary care and was, therefore, guilty of negligence, and that such negligence was the proximate cause of his loss. In his efforts to carry the burden he testified and called four other witnesses, among them being the defendant whom he tendered under the adverse party rule. Plaintiff's first witness was Mr. McCarver, City Manager, of Hearne, who testified to the effect that he was in his office when the general alarm of the fire department sounded, and that he went immediately to the airport, and when he got there the hanger in the airport was completely engulfed in flames; that the fire department had arrived prior to his arrival; that the airplane was a total loss; that he had a talk with defendant West while the fire was in the process of burning, and testified in part, specifically:

"Q. Did you have occasion to ask him what caused the fire?

"A. I don't recall whether I asked him, but I know in the process of our conversation he told me what he thought caused it.

"Q. * * * would you tell this court and jury what he said caused that fire?

"A. If I recall right, he said that he was in the process of painting this plane and had put some heat lamps of some description, which I didn't see, to kind of speed up the process of drying this plane, this paint job that he was doing.

"Q. What, if anything happened after he put the lamps on it?

"A. I don't know. I just know that the building was on fire when I got there.

"Q. * * * did he mention anything about being called out of the building while the plane was drying?

"A. I believe he told me that after he had put the lamps in place that he was called out of the building for some purpose, I don't know, what, and then the next thing he knew the building was on fire.

\* \* \* \* \* \* :

"Q. * * * you said that Mr. West told you that he thought the fire had been caused by leaving the lamps left on close to the plane or in proximity of the plane?

"Q. I don't recall him saying that actually caused the fire, but he told me that was what he was doing prior to the fire starting. He had put the lamps there. I don't recall him stating he knew that caused the fire or not, but he did say that was what he was in the process of doing."

Defendant West testified to the effect that he was an airport manager, and was a pilot and mechanic and inspector, and that he received the airplane for the purpose of inspection and to repair the plane; that he was to do all the necessary repair and inspection as to what they call a periodic inspection for continuation of the air worthiness certificate. He testified in part:

"Q. I want you to tell that jury what your present testimony is in regard to the cause of that fire?

"A. My present testimony is I don't know what caused it. I had been working on the electrical system, had checked over the outside, the external appearance of the engine. I went to the battery and checked it over, cleaned it up, put the battery cover back on, and was in process of checking the function of the electrical system, the lights are the principal things, instrumental panel and things that operate electrically.

"Q. Were you called out of the hanger at that time?

"A. Yes.

"Q. What caused you to leave the hanger?

"A. I'm not too sure. I could have been gone for a certain toll or it could have been the telephone. My immediate composure and chain of thought were so disrupted when I came back, I don't remember what happened—I mean I don't remember the immediate thing.

"Q. Is it your present testimony that immediately prior to the fire made the basis of this action, you were not drying paint on that airplane with an heat lamp?

"A. I know now that I was not.

"Q. Well, now, you have heard these gentlemen testify that you told them that you were. Have you

changed your mind since you talked with them?

"A. Yes. But it was in this nature: It is not because drying the dope was anything reckless or any denial that I used that process. I could have been using it at that time. Those are necessary processes. But extreme excitement at the time, and mostly I was concerned with saving the airplane and saving what I could, and I gave no thought to the immediate thing except the memory that was so fixed in my mind when I am using lights. There are so many precautions to be made that it makes you more or less nervous and conscious of it and you have to be very careful because there are unforeseen things that happen.

"Q. Lights can cause the fabrics to flare up and burn up an airplane, can they not?

"A. No, not unless someone strikes them and forces the light against it or else the light had been put too close, which I certainly did not do.

"Q. You wouldn't say then that in the event the heat lamp is too close to the airplane the airplane couldn't catch fire and burn, would you?

"A. You could get it too close, yes sir.

"Q. Let's go on to the fire extinguishers. Did you have fire extinguishers available to you?

"A. I did, yes sir.

"Q. Were they functioning at this time?

"A. They were.

"Q. Now, you just heard these gentlemen testify that you told them that they were not. Are they mistaken?

"A. They were mistaken.

"Q. You didn't ever say that or you didn't have a fire extinguisher?

"A. I didn't say either one.

"Q. What did you say?

"A. I said the fire extinguisher was in the shop.

"Q. Where was the shop?

"A. It's just adjacent, I guess about six feet from the airplane.

"Q. Was it working properly?

"A. It was.

"Q. Why didn't you use it?

"A. When I came out to the airplane and saw flame on top of two gas tanks and from three or four hose connections on the fuel line, I realized that there wasn't anything that could save that airplane. It was already lost and nothing could put the fire out, not one man. If you had a whole fire department with a fog truck, they might. But not me with one fire extinguisher. The one thing I could do was to save two airplanes that had considerable value, and that's what I did.

"Q. You made mention of one fire extinguisher. Did you have small extinguishers available to you?

"A. Yes.

"Q. Where were they?

"A. I don't recall right now where they were. They were somewhere about the front of the place there, a shed or office that I used. They were not burned. But they would have been useless. Ten men with fire extinguishers

couldn't have handled it, not pyrene.

"Q. Did you leave the master switch on that energizes these electrical circuits, at the time you either went to answer the telephone or get the tool?

"A. I believe I did.

"Q. Could or might that cause a fire in the aircraft?

"A. It could.

"Q. It is customary when storing the aircraft or leaving the aircraft for any purpose to turn the master switch off?

"A. I would say so for storing. For service, it is frequently left on during the whole working day.

"Q. Do you know where those Pyrene fire extinguishers were at the time of the fire?

"A. I do not.

"Q. Mr. West had you been using a light to dry dope or paint on the aircraft prior to the fire?

"A. I had.

"Q. *But your testimony is that on the day of the fire you weren't using any lamp, is that correct?*

"A. *That is correct.*" (Emphasis added.)

Roy Trippi testified to the effect that he is an agricultural pilot, and an aircraft mechanic, and that he has a license issued by the Federal Aviation Agency; that he worked as a pilot in the summertime, and in the winter he worked as a mechanic from the time that he left the Air Force in 1956, until the present time; that he worked about fifty-fifty as a mechanic and pilot. He testified in part specifically:

"Q. Were you at the Hearne Airport on Thanksgiving afternoon, the day before the fire?

"A. Yes, sir.

"Q. What was Mr. West doing at that time?

"A. When I observed he was patching the left wing on the airplane in question.

"Q. How long were you there?

"A. I would estimate two or three hours.

"Q. What time did you leave?

"A. Well, as near as I can remember, it was just before dark. At that time it was between five and six o'clock.

"Q. Did Mr. West leave with you?

"A. As near as I can remember he left at the same time.

"Q. What was he doing immediately preceding the time you left?

"A. He was applying dope to one of these patches on the left wing of the airplane.

"Q. What was the weather condition at that time?

"A. It was cold. It was too cold for natural drying of dope.

"Q. Would it have been necessary to apply artificial heat in order to dry the dope?

"A. Yes, sir.

"Q. How far away was the light that you observed, from the fabric, on that afternoon?

"A. I would say approximately twenty-four inches.

"Q. Is it usual and customary to use lamps or other artificial heat, when the atmospheric conditions are such that the dope won't dry under natural conditions?

"A. Yes, sir."

■ So, we come back to Point 1, which is to the effect that the Court erred in granting appellee's motion for judgment non obstante veredicto on the ground that the evidence raised no issue of fact, other than damages, and further held that a directed verdict would have been proper. The decision on the foregoing question has given us much concern, and we have given much consideration to the testimony and the applicable law, and after so doing we are of the view that we cannot say as a matter of law that there was no evidence or insufficient evidence tendered to support the jury's verdict acquitting the defendant of negligence.

■ We have previously underscored the following Question and Answer thereto by defendant West:

"Q. But your testimony is that on the day of the fire you weren't using any lamp, is that correct?

"A. That is correct."

As we understand the rule in Texas it is, where you have a jury the trial court cannot decide what witnesses are credible or incredible. That is the function of the jury. In Olds v. Traylor, 180 S.W.2d 511, w. ref., pts. (8, 9), we find this rule as to a directed verdict:

"Where the facts are controverted, or are such that different inferences may be reasonably drawn therefrom, an issue of fact is raised; it is only where the evidence is harmonious and consistent, and the circumstances permit of but one conclusion, that the question becomes one of law for the determination of the court. An issue of fact is raised 'if, discarding all adverse evidence, and giving credit to all evidence favorable to the plaintiff, and indulging every legitimate conclusion favorable to the plaintiff which might have been drawn from the facts proved, a jury might have found in favor of the plaintiff.' "

Our Supreme Court has not seen fit to modify or change that rule. See Cartwright v. Canode, 106 Tex. 502, 171 S.W. 696, pt. 2, Sp.Ct.; See also White v. White, 141 Tex. 328, 172 S.W.2d 295, pts. 1–5, Sp.Ct. See also Texas L.Rev., Vol. 38, April 1960, p. 368, Article by Chief Justice Calvert, entitled, "No Evidence" and "Insufficient Evidence":

"1. When the only point of error is a 'No Evidence' Point

"If the only point of error in a brief in a Court of Civil Appeals is a 'no evidence' point, the court may, of course, either overrule it or sustain it.

"If the point is overruled the court must affirm. The court cannot, after concluding that there is evidence to support a finding of a vital fact, reverse the judgment and remand the cause for further development of the evidence, because the case was tried on a wrong theory, or because a retrial would better serve the ends of justice. The reason the court may not do so is that it may not reverse an errorless judgment.

"If the court sustains a 'no evidence' point, its normal course is to render judgment for the appellant because that is the judgment the trial court should have rendered. It should not remand for the sole purpose of affording the appellee 'another bite at the apple' ".

Appellant's Point 1 is sustained. See opinion of Supreme Court in Wilbanks v. Wilbanks, 160 Tex. 317, 330 S.W.2d 607, and cases there cited. See also Franke v. Cheatham, 157 Tex. 397, 303 S.W.2d 355, Sp.Ct.; Biggers v. Continental Bus System, 157 Tex. 351, 303 S.W.2d 359, Sp.Ct.

Under the foregoing view it is our duty to reverse and render this cause. Reversed and rendered.